IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SUSAN ACREE, § | |
|     PLAINTIFF, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:05-CV-721-A |
| § | |
| JO ANNE B. BARNHART, § | |
| COMMISSIONER OF SOCIAL SECURITY, § | |
|     DEFENDANT. § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.   STATEMENT OF THE CASE

Plaintiff Susan Acree brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act. Acree applied for disability insurance and SSI benefits on May 7, 2003, alleging disability beginning January 1, 2002 due to multiple physical and mental impairments. (Tr. 74, 330). She maintained her insured status at all times relevant to the Commissioner's decision.

The Social Security Administration denied Acree's applications for benefits both initially and on reconsideration. Acree requested a hearing before an administrative law judge (the "ALJ"), and ALJ Herbert J. Green held a hearing on August 12, 2004 in Fort Worth, Texas. At the end of that hearing, the ALJ determined that a consultative psychological assessment was necessary. (Tr. 398-408). After receiving the report from the consultative psychological evaluation, the ALJ held a supplemental hearing on November 30, 2004. (Tr. 377-97). On December 18, 2004, the ALJ issued a decision that Acree was not disabled and was not entitled to disability insurance or SSI benefits. (Tr. 14-24). The Appeals Council denied Acree's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B.   STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in*

*Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is

more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.   ISSUES

Whether the residual functional capacity assessment is supported by substantial evidence.

D.   ADMINISTRATIVE RECORD

1.   Treatment History

The medical records in the administrative transcript provide the following information about Acree's treatment history: Acree sought medical care from the local county health clinic on June 19, 2002. (Tr. 275). She reported a history of asthma and diabetes mellitus. During a follow-up appointment on July 11, 2002, she complained of intermittent chest pain for the past few days. (Tr. 274). An electrocardiogram (EKG) and chest x-ray were interpreted as negative. (Tr. 269-70). An EKG and chest x-ray performed on October 9, 2002 again yielded unremarkable results, as did another EKG, a chest x-ray, and a computed tomography (CT) scan of Acree's head performed on January 7, 2003. (Tr. 256-58, 262-63).

On February 13, 2003, Acree was seen at the county's behavioral clinic and reported delusional thoughts, including thoughts that her body was separated from her head. (Tr. 204, 206-11). She complained of problems sleeping, becoming disoriented, and increased anxiety. She reported a previous hospitalization for anxiety. She was disheveled, tense, and guarded during her

mental status examination. (Tr. 208). Her depression, mood, irritability, and anxiety were assessed as minimally elevated. (Tr. 208). Acree was oriented and her thought process were unremarkable, but her judgment and insight were assessed as poor. The staff psychiatrist diagnosed anxiety disorder with a current Global Assessment of Functioning (GAF) score of 50.[1] (Tr. 209).

Acree was hospitalized on March 3, 2003 with complaints of chest pain and left upper quadrant pain. (Tr. 307). She reported that the pain was brought on by walking and the pain was worse when she felt anxious. She was moved to the telemetry unit on March 4, 2003 after a positive adenosine thallium test,[2] and underwent a cardiac catheterization on March 7, 2003 that showed a left ventricular ejection fraction of 70%[3] with normal coronary arteries. (Tr. 307). She was discharged on March 8, 2003 with a diagnosis of atypical chest pain. (Tr. 223, 307-08).

Acree returned to the behavioral health clinic on March 27, 2003. (Tr. 204). She did not think her medication, Zoloft, was helping as much as it could. She was unkempt and tense. Her depression and anxiety levels were considered to be in the moderate range. Her diagnosis was major depressive disorder, moderate, and situational anxiety. (Tr. 205). At a check-up six weeks later, Acree reported that she continued to feel anxious and depressed. Her Zoloft prescription was increased. (Tr. 202-03).

---

[1] A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 41-50 reflects serious symptoms or serious impairment in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

[2] The test is used for the detection of coronary artery disease. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1814 (29th ed. 2000).

[3] Ejection fraction is the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole, and is often expressed as a percentage. It is normally sixty-five percent (plus or minus eight percent), and lower values indicate ventricular dysfunction. *Id.* at 708.

Acree attended a consultative internal medicine evaluation with Chandra Mudaliar, M.D., on June 30, 2003. (Tr. 142). Acree stated that she had sustained an injury in 1984 that caused low back pain and pain in her arms and legs. Acree complained that her brain "does not function" and that she had a poor memory. Acree estimated that she could walk for about half a mile, sit for about an hour, and stand for five to ten minutes. (Tr. 142).

Mudaliar performed a physical examination, which yielded few remarkable findings. Her reflexes were hyperactive, but no sensory deficits were noted. Acree's lumbar spine was tender, and straight leg raising was restricted and painful. She was able to bend forward and bring her fingertips to her knees, but she was unable to hop or squat. (Tr. 143). An EKG, another chest x-ray, and a lumbar spine x-ray were unremarkable. Mudaliar assessed fibromyalgia, diabetes mellitus that was well controlled, essential hypertension, and history of a major depressive disorder. Mudaliar opined that Acree's biggest problem was her mental status. (Tr. 143).

Additional chest x-rays and cervical spine x-rays were taken on July 4, 2003, but revealed no significant findings. (Tr. 199, 201). An x-ray of Acree's right shoulder taken the same day showed degenerative joint disease.(Tr. 200).

On July 7, 2003, Acree underwent a consultative psychiatric examination with Tara Reddy, M.D. (Tr. 148). Acree complained of depression and anxiety, for which she was taking Zoloft and Neurontin. She reported increased depression following a death in the family, sleeping erratically, eating irregularities, an inability to focus or sustain attention, difficulty making decisions, fatigue, and worrying. (Tr .148). Acree lived with her thirteen-year-old son. She cooked, cleaned, did laundry, shopped, handled the mail, watched television, listened to the radio, walked about a block each day, and attended church. (Tr. 148). Reddy observed that Acree appeared preoccupied with

6

somatic complaints. A mental status examination was unremarkable. Reddy diagnosed major depression, recurrent and moderate, and assessed a current GAF score of 65.[4] (Tr. 149).

Acree saw her primary care physician on September 4, 2003 for complaints of back pain and asthma. (Tr. 293). X-rays of her cervical spine and right humerus taken October 2, 2003 were interpreted as negative. (Tr. 187-88). Another CT head scan was also unremarkable. (Tr. 190). An x-ray of Acree's right shoulder showed degenerative osteoarthritis, and the radiologist noted a lack of motion in the shoulder that suggested immobility due to pain or fixation of the joint. (Tr. 189).

Acree went to Tarrant County Mental Health and Mental Retardation (MHMR) services on July 21, 2004 with complaints of decreased sleep, tearfulness, sadness, mood swings, rapid speech, energy fluctuations, decreased concentration, increased isolation, paranoia, and delusions. (Tr. 311). The intake clinician assessed a schizoaffective disorder, bipolar type, with a current GAF score of 45. (Tr. 310).

    2.    First Administrative Hearing

Acree testified that she was born March 28, 1953 and was fifty-one years old. (Tr. 400-01). She completed high school and training to become a medical assistant. She testified that she was unable to work because of crippling symptoms in her hands, feet, and brain. (Tr. 403). Based on Acree's comments during the hearing, the ALJ suspended the hearing pending a psychological evaluation. (Tr. 407).

---

[4] A GAF score of 65 reflects mild symptoms or some difficulty in social, occupational or school functioning, but the individual is generally functioning pretty well. DSM-IV at 34.

3.      Post-Hearing Consultative Evaluation

Acree attended a consultative psychological examination with Evan Knapp, Ph.D., on September 13, 2004. (Tr. 315). She complained of depression that had begun two to three years earlier. She reported difficulty completing tasks, hearing voices and sounds, and brain damage after her head separated from her body. She also reported a "brain stroke" in April 2003. (Tr. 315). She complained of feeling depressed about ninety percent of the time. She paid some, but not all, of her bills. She cleaned when was able, and needed her daughter's assistance with the grocery shopping. Acree denied doing any enjoyable activities. She said she was able to interact with others, but found it difficult to visit with people because she felt insecure. Knapp observed problems with Acree's coherence and ability to sustain focus. He also opined that Acree had likely experienced job terminations related to her inability to complete tasks appropriately or cope with stress. (Tr. 317).

Knapp noted that Acree was cooperative, but many of her responses were not coherent or logical and she struggled to express herself. Acree appeared preoccupied with thoughts of a brain disorder and a delusional thought process was apparent. (Tr. 318). Knapp also noted that Acree reported a high degree of perceptual distortions and auditory, visual, tactile, and olfactory hallucinations. Acree exhibited a fairly constricted affect and her mood was generally mildly depressed during the interview. (Tr. 318). Acree was oriented, and her memory for current and remote events was intact. She was able to complete simple serial mathematical calculations, and her proverb interpretation was abstract, but not relevant to the proverb given. Knapp considered Acree to be of below-average intelligence with questionable judgment. (Tr. 319).

Knapp administered a battery of tests and opined that Acree's scores reflected moderate to severe brain dysfunction. (Tr. 319). He also noted that Acree's scores on intelligence testing

8

resulted in a full scale IQ score of 67, which was a score consistent with mild mental retardation. (Tr. 319). Knapp diagnosed schizophrenia of an undifferentiated type; major depressive disorder; and mild mental retardation. He assessed a current GAF score of 40.[5] (Tr. 320). Acree's prognosis was listed as fair with continued psychiatric services.

Knapp completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), and in his statement, indicated that Acree would have slight limitation in her ability to understand and remember short simple instructions, and moderate limitation in carrying out short simple instructions. (Tr. 322). He opined that Acree was markedly limited in her ability to understand and remember detailed instructions; carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public; interact appropriately with supervisors or coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (Tr. 323).

    4.    Supplemental Administrative Hearing

During the supplemental hearing in November 2004, Acree testified that she had work experience as a convenience store cashier. She was terminated from her most recent job in 2001 for failing to complete the paperwork required as part of her job duties. (Tr. 382). She later attempted to work at a retail clothing store, but quit because she was unable to do what her supervisor asked her to do. (Tr. 382-83). Acree testified that she lived with her teenaged son. She stayed home most of the time. (Tr. 383). Acree had used the city bus system to get to the hearing, although she had her son miss school to accompany her. She testified that she was able to ride the bus by herself, and

---

[5] A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work, school, family relations, judgment, thinking, and mood. *Id*. at 34.

she usually used the bus for transportation to her medical appointments. (Tr. 384).

Acree testified that she occasionally walked for a mile or so while pulling a wagon and picking up cans for exercise. She did not think she could work at even a simple job, however, because she had to struggle to accomplish her daily tasks at home. (Tr. 384). She testified that she did not sleep well, had crying spells, and continued to hear voices. (Tr. 386). She complained that she was unable to accomplish tasks with deadlines, and she tended to forget projects she had started. (Tr. 388). She testified that she stayed home most of the time because she disliked people. (Tr. 389). In addition to her mental problems, Acree complained of shoulder and back problems that limited her activities. (Tr. 386).

Medical expert John Simonds, M.D., also testified. He noted that Acree had some impairments, including diabetes, a history of heart problems, and osteoarthritis in her right shoulder. Acree also had mental impairments with diagnoses that had changed over time and included anxiety disorder, major depression, schizoaffective disorder, schizophrenia, and mild mental retardation. (Tr. 390). Simonds testified that Acree had no impairments meeting or equaling a listing, but she needed light work that avoided heavy lifting, was very simple, and required only superficial contact with the public due to her anxiety symptoms. (Tr. 391).

Vocational expert Shelly Eike testified that Acree had previous work experience as a salad bar attendant, which was light and semi-skilled work; a sales attendant, which was light and unskilled work; as a cashier and convenience store clerk, which was light and unskilled or semi-skilled work; and as a dining room attendant, which was also light, unskilled work. (Tr. 396). The ALJ asked Eike to consider an individual of Acree's age, education, and work experience who was limited to light work that was simple and did not involve the general public. (Tr. 396). Eike

testified that there were several suitable jobs, including unskilled work as a packing line attendant (with 2000,000 such jobs available nationally); small product assembler (with at least 250,000 jobs available nationally); and sorter (with at least 80,000 jobs available nationally). (Tr. 396).

  5.  ALJ Decision

The ALJ found that Acree had made unsuccessful work attempts, but had not engaged in substantial gainful activity since her alleged onset date.  In addition, she had multiple impairments that were considered severe for purposes of the Social Security Act, including diabetes mellitus, fibromyalgia, asthma, degenerative joint disease, hypertension with left ventricular hypertrophy, obesity, anxiety, and depression versus a schizoaffective disorder. (Tr. 15).  However, the ALJ found that Acree had no impairment or impairments listed in or equal in severity to an impairment included in the listing of impairments.  After reviewing the objective medical record and Acree's complaints, the ALJ found that Acree retained the residual functional capacity for light work activity that is simple in nature, does not require interaction with the general public, and can be performed by a person with a less-than-moderate concentration deficit.  Based on the vocational expert's testimony, the ALJ found that there were a significant number of jobs available in the national economy that Acree could perform.  Accordingly, the ALJ found Acree was not disabled and was not eligible for disability insurance or SSI benefits. (Tr. 23-24).

D.     DISCUSSION

Acree contends that the ALJ's assessment of her physical and mental residual functional capacity (RFC) is not supported by substantial evidence. RFC reflects the most that an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id*. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id*. The responsibility for deciding on a claimant's RFC rests with the ALJ at the administrative hearing level. 20 C.F.R. §§ 404.1546(c), 416.946(c).

With respect to her physical limitations, Acree asserts that the determination that she retained the ability to perform light work is not based upon substantial evidence because the only evidence supporting the ALJ's assessment is found in the medical expert's testimony. Acree contends that the medical expert was not qualified to offer testimony on her physical impairments because Simonds' speciality is psychiatry.[6] She also complains that she was not given an opportunity to object to Simonds' qualifications before or during the hearing.

---

[6] Acree points out some confusion at the beginning of the medical expert's testimony when he states that Acree has no medically determinable impairments; however, this testimony appears to be the result of confusion about the ALJ's questions because the medical expert proceeded to identify and discuss both physical and mental impairments documented in Acree's treatment history. (Tr. 389).

Administrative law judges may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and whether the impairments equal the requirements of any listed impairment. 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). Acree does not cite any regulation, ruling, or other provision giving her an absolute right to object to the ALJ's selection of a medical expert, and she does not dispute that Simonds is a licensed physician and acceptable medical source under the regulations. *See generally* 20 C.F.R. §§ 404.1513(a)-(c), 416.913(a)-(c). At most, Simonds' area of medical specialty would affect the weight given his testimony, not his qualifications to provide that testimony. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). The ALJ's choice of a psychiatrist to provide medical expert testimony during the hearing is also reasonable given Acree's treatment history and Mudaliar's opinion that Acree's mental status was her biggest problem.[7]

Although Acree asserts that Simonds and the ALJ gave insufficient consideration to the degenerative condition in her right shoulder, Simonds expressly testified that Acree should avoid heavy lifting because of osteoarthritis in her shoulder.[8] (Tr. 390). The ALJ likewise found that Acree's reported pain, whether from fibromyalgia or arthritis, would limit her to light exertional effort. (Tr. 22). Acree does not identify any evidence that would suggest greater physical limitations than those recommended by the medical expert and imposed by the ALJ.

Acree also contends that the ALJ erroneously stated that he had reached the same conclusion

---

[7] The ALJ found Mudaliar's statement was ambiguous as it did not clarify whether Acree demonstrated significant psychiatric impairment, although Mudaliar's report did not note any behavior that would support this conclusion, or whether Mudaliar simply meant that any alleged disability would be unrelated to Acree's physical condition. (Tr. 17). Mudaliar's specialty is internal medicine.

[8] Acree agrees that degenerative joint disease and osteoarthritis are synonymous. (Plf. Br. at 12).

13

as the state agency medical consultants who had previously reviewed Acree's applications.  Acree correctly notes that the state agency medical consultants found her capable of medium work, not light work.  (Tr. 151-58).  Actually, the ALJ stated that he agreed with the state agency medical consultants to the extent they had found no impairment or combination of impairments that met or equaled the severity of a listed impairment,  (Tr. 20); however, the ALJ also stated that his residual functional capacity determination was in no way based on the opinions of the state agency medical consultants.[9]  (Tr .22).

Acree also contends that the determination that she retained the mental capacity for other work available in the national economy is not based upon substantial evidence because the ALJ should have given controlling weight to Knapp's consultative evaluation, not the opinions offered by Simonds or consultative psychiatrist Reddy.  The ALJ considered Acree's mental health history, the consultative evaluations, and Simonds' testimony, and determined that Simonds' training and decades of experience as a psychiatrist made him more qualified to assess Acree's mental status than MHMR clinicians or Knapp.  (Tr. 20).  More particularly, the ALJ adopted Simonds' testimony that Knapp's conclusion that Acree was mentally retarded was hard to accept based on Acree's work history and the observations of consultative psychiatrist Reddy, who reported that Acree exhibited good concentration and average intelligence during her evaluation in mid-2003.  The ALJ found no evidence in the record of a brain injury that would have caused a sudden loss of cognitive abilities, and accepted Simonds' explanation that depression could cause a person to score lower on

---

[9] Additionally, Acree can demonstrate no harm or prejudice even if the ALJ had misrepresented that he concurred with the state agency medical consultants.  The state agency medical consultants opined that Acree was capable of medium work activity, and the ability to perform medium work includes the ability to perform work at a lighter level of exertion. 20 C.F.R. §§ 404.1567(c), 416.967(c).

intelligence tests. (Tr. 20). The ALJ also noted lengthy gaps between Acree's efforts to secure mental health treatment, (Tr. 18-19, 21), and additional inconsistencies in Acree's testimony and the other evidence that caused him to discount her subjective complaints. (Tr. 21-22).

Acree asserts that Reddy's examination was neither as thorough or as extensive as Knapp's,[10] but the weight and credibility to be assigned to expert and lay sources are the prerogative of the ALJ. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990). A review of the ALJ's decision shows that he gave sufficient consideration to the consultative evaluations, Acree's history of mental health treatment, and Simonds' testimony before rejecting Knapp's opinions that would have required a finding of disability. Acree may disagree with the ALJ's credibility assessment, but personal disagreements are an insufficient basis for disturbing the Commissioner's decision.

Substantial evidence supports the ALJ's assessment of Acree's residual functional capacity for light work that does not require interaction with the general public and consists of simple tasks that accommodate a less-than-moderate concentration deficit. The ALJ's determination that Acree retained the ability to perform other work available in significant numbers in the national economy is also supported by substantial evidence and has not been showed to be a product of legal error.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

---

[10] Acree also contends that Reddy would be motivated to skew her findings in favor of the entity paying her fees. Acree's contention should be rejected as wholly speculative. Nor is the court persuaded by Acree's argument that the brevity of Reddy's written report somehow makes Reddy's findings more questionable than Knapp's.

15

### NOTICE OF RIGHT TO OBJECT TO PROPOSED
### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until August 3, 2006.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until August 3, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JULY 13, 2006.

    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE